(Slip Opinion)          OCTOBER TERM, 2010                          1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## NATIONAL AERONAUTICS AND SPACE ADMINI-STRATION ET AL. *v.* NELSON ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 09–530.   Argued October 5, 2010—Decided January 19, 2011

The National Aeronautics and Space Administration (NASA) has a
workforce of both federal civil servants and Government contract em-
ployees.  Respondents are contract employees at NASA's Jet Propul-
sion Laboratory (JPL), which is operated by the California Institute
of Technology (Cal Tech).  Respondents were not subject to Govern-
ment background checks at the time they were hired, but that
changed when the President ordered the adoption of uniform identifi-
cation standards for both federal civil servants and contractor em-
ployees.  The Department of Commerce mandated that contract em-
ployees with long-term access to federal facilities complete a standard
background check, typically the National Agency Check with Inquir-
ies (NACI), by October 2007.  NASA modified its contract with Cal
Tech to reflect the new requirement, and JPL announced that em-
ployees who did not complete the NACI process in time would be de-
nied access to JPL and face termination by Cal Tech.

   The NACI process, long used for prospective civil servants, begins
with the employee filling out a standard form (here, Standard Form
85, the Questionnaire for Non-Sensitive Positions (SF–85)).  SF–85
asks whether an employee has "used, possessed, supplied, or manu-
factured illegal drugs" in the last year.  If so, the employee must pro-
vide details, including information about "treatment or counseling re-
ceived."   The employee must also sign a release authorizing the
Government to obtain personal information from schools, employers,
and others during its investigation.  Once SF–85 is completed, the
Government sends the employee's references a questionnaire (Form
42) that asks open-ended questions about whether they have "any
reason to question" the employee's "honesty or trustworthiness," or

have "adverse information" concerning a variety of other matters. All SF–85 and Form 42 responses are subject to the protections of the Privacy Act.

With the deadline for completing the NACI process drawing near, respondents brought suit, claiming, as relevant here, that the background-check process violates a constitutional right to informational privacy. The District Court declined to issue a preliminary injunction, but the Ninth Circuit reversed. It held that SF–85's inquiries into recent drug involvement furthered the Government's interest in combating illegal-drug use, but that the drug "treatment or counseling" question furthered no legitimate interest and was thus likely to be held unconstitutional. It also held that Form 42's open-ended questions were not narrowly tailored to meet the Government's interests in verifying contractors' identities and ensuring JPL's security, and thus also likely violated respondents' informational-privacy rights.

*Held*:

1. In two cases decided over 30 years ago, this Court referred broadly to a constitutional privacy "interest in avoiding disclosure of personal matters." *Whalen* v. *Roe*, 429 U. S. 589, 599–600; *Nixo*n v. *Administrator of General Services*, 433 U. S. 425, 457. In *Whalen,* the Court upheld a New York law permitting the collection of names and addresses of persons prescribed dangerous drugs, finding that the statute's "security provisions," which protected against "public disclosure" of patient information, 462 U. S., at 600–601, were sufficient to protect a privacy interest "arguably . . . root[ed] in the Constitution," *id.,* at 605. In *Nixon,* the Court upheld a law requiring the former President to turn over his presidential papers and tape recordings for archival review and screening, concluding that the federal Act at issue, like the statute in *Whalen*, had protections against "undue dissemination of private materials." 433 U. S, at 458. Since *Nixon,* the Court has said little else on the subject of a constitutional right to informational privacy. Pp. 8–10.

2. Assuming, without deciding, that the Government's challenged inquiries implicate a privacy interest of constitutional significance, that interest, whatever its scope, does not prevent the Government from asking reasonable questions of the sort included on SF–85 and Form 42 in an employment background investigation that is subject to the Privacy Act's safeguards against public disclosure. Pp. 10–24.

(a) The forms are reasonable in light of the Government interests at stake. Pp. 11–19.

(1) Judicial review of the forms must take into account the context in which the Government's challenged inquiries arise. When the Government acts in its capacity "as proprietor" and manager of its

Syllabus

"internal operation," *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 896, it has a much freer hand than when it regulates as to citizens generally. The questions respondents challenge are part of a standard background check of the sort used by millions of private employers. The Government has been conducting employment investigations since the Republic's earliest days, and the President has had statutory authority to assess an applicant's fitness for the civil service since 1871. Standard background investigations similar to those at issue became mandatory for federal civil-service candidates in 1953, and the investigations challenged here arose from a decision to extend that requirement to federal contract employees. This history shows that the Government has an interest in conducting basic background checks in order to ensure the security of its facilities and to employ a competent, reliable workforce to carry out the people's business. The interest is not diminished by the fact that respondents are contract employees. There are no meaningful distinctions in the duties of NASA's civil-service and contractor employees, especially at JPL, where contract employees do work that is critical to NASA's mission and that is funded with a multibillion dollar taxpayer investment. Pp. 12–15.

(2) The challenged questions on SF–85 and Form 42 are reasonable, employment-related inquiries that further the Government's interests in managing its internal operations. SF–85's "treatment or counseling" question is a followup question to a reasonable inquiry about illegal-drug use. In context, the drug-treatment inquiry is also a reasonable, employment-related inquiry. The Government, recognizing that illegal-drug use is both a criminal and medical issue, seeks to separate out those drug users who are taking steps to address and overcome their problems. Thus, it uses responses to the drug-treatment question as a mitigating factor in its contractor credentialing decisions. The Court rejects the argument that the Government has a constitutional burden to demonstrate that its employment background questions are "necessary" or the least restrictive means of furthering its interests. So exacting a standard runs directly contrary to *Whalen*. See 429 U. S., at 596–597. Pp. 16–18.

(3) Like SF–85's drug-treatment question, Form 42's open-ended questions are reasonably aimed at identifying capable employees who will faithfully conduct the Government's business. Asking an applicant's designated references broad questions about job suitability is an appropriate tool for separating strong candidates from weak ones. The reasonableness of such questions is illustrated by their pervasiveness in the public and private sectors. Pp. 18–19.

(b) In addition to being reasonable in light of the Government in-

terests at stake, SF–85 and Form 42 are also subject to substantial protections against disclosure to the public. *Whalen* and *Nixon* recognized that a "statutory or regulatory duty to avoid unwarranted disclosures" generally allays privacy concerns created by government "accumulation" of "personal information" for "public purposes." *Whalen*, *supra,* at 605. Respondents attack only the Government's collection of information, and here, as in *Whalen* and *Nixon*, the information collected is shielded by statute from unwarranted disclosure. The Privacy Act—which allows the Government to maintain only those records "relevant and necessary to accomplish" a purpose authorized by law, 5 U. S. C. §552a(e)(1); requires written consent before the Government may disclose an individual's records, §552a(b); and imposes criminal liability for willful violations of its nondisclosure obligations, §552a(i)(1)—"evidence[s] a proper concern" for individual privacy. *Whalen*, *supra*, at 605; *Nixon*, *supra*, at 458–459. Respondents' claim that the statutory exceptions to the Privacy Act's disclosure bar, see §§552a(b)(1)–(12), leave its protections too porous to supply a meaningful check against unwarranted disclosures. But that argument rests on an incorrect reading of *Whalen, Nixon,* and the Privacy Act. Pp. 19–23.

530 F. 3d 865, reversed and remanded.

ALITO, J., delivered the opinion of the Court, in which ROBERTS, C. J., and KENNEDY, GINSBURG, BREYER, and SOTOMAYOR, JJ., joined. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined. THOMAS, J., filed an opinion concurring in the judgment. KAGAN, J., took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–530

_____

## NATIONAL AERONAUTICS AND SPACE ADMINISTRATION, ET AL., PETITIONERS *v.* ROBERT M. NELSON ET AL.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[January 19, 2011]

JUSTICE ALITO delivered the opinion of the Court.

In two cases decided more than 30 years ago, this Court referred broadly to a constitutional privacy "interest in avoiding disclosure of personal matters." *Whalen* v. *Roe*, 429 U. S. 589, 599–600 (1977); *Nixo*n v. *Administrator of General Services*, 433 U. S. 425, 457 (1977). Respondents in this case, federal contract employees at a Government laboratory, claim that two parts of a standard employment background investigation violate their rights under *Whalen* and *Nixon*. Respondents challenge a section of a form questionnaire that asks employees about treatment or counseling for recent illegal-drug use. They also object to certain open-ended questions on a form sent to employees' designated references.

We assume, without deciding, that the Constitution protects a privacy right of the sort mentioned in *Whalen* and *Nixon*. We hold, however, that the challenged portions of the Government's background check do not violate this right in the present case. The Government's interests as employer and proprietor in managing its internal op-

erations, combined with the protections against public dissemination provided by the Privacy Act of 1974, 5 U. S. C. §552a, satisfy any "interest in avoiding disclosure" that may "arguably ha[ve] its roots in the Constitution." *Whalen, supra*, at 599, 605.

I

A

The National Aeronautics and Space Administration (NASA) is an independent federal agency charged with planning and conducting the Government's "space activities." Pub. L. 111–314, §3, 124 Stat. 3333, 51 U. S. C. §20112(a)(1). NASA's workforce numbers in the tens of thousands of employees. While many of these workers are federal civil servants, a substantial majority are employed directly by Government contractors. Contract employees play an important role in NASA's mission, and their duties are functionally equivalent to those performed by civil servants.

One NASA facility, the Jet Propulsion Laboratory (JPL) in Pasadena, California, is staffed exclusively by contract employees. NASA owns JPL, but the California Institute of Technology (Cal Tech) operates the facility under a Government contract. JPL is the lead NASA center for deep-space robotics and communications. Most of this country's unmanned space missions—from the Explorer 1 satellite in 1958 to the Mars Rovers of today—have been developed and run by JPL. JPL scientists contribute to NASA earth-observation and technology-development projects. Many JPL employees also engage in pure scientific research on topics like "the star formation history of the universe" and "the fundamental properties of quantum fluids." App. 64–65, 68.

Twenty-eight JPL employees are respondents here. Many of them have worked at the lab for decades, and none has ever been the subject of a Government back-

ground investigation. At the time when respondents were hired, background checks were standard only for federal civil servants. See Exec. Order No. 10450, 3 CFR 936 (1949–1953 Comp.). In some instances, individual contracts required background checks for the employees of federal contractors, but no blanket policy was in place.

The Government has recently taken steps to eliminate this two-track approach to background investigations. In 2004, a recommendation by the 9/11 Commission prompted the President to order new, uniform identification standards for "[f]ederal employees," including "contractor employees." Homeland Security Presidential Directive/HSPD–12—Policy for a Common Identification Standard for Federal Employees and Contractors, Public Papers of the President, George W. Bush, Vol. 2, Aug. 27, p. 1765 (2007) (hereinafter HSPD–12), App. 127. The Department of Commerce implemented this directive by mandating that contract employees with long-term access to federal facilities complete a standard background check, typically the National Agency Check with Inquiries (NACI). National Inst. of Standards and Technology, Personal Identity Verification of Federal Employees & Contractors, pp. iii–vi, 1–8, 6 (FIPS PUB 201–1, Mar. 2006) (hereinafter FIPS PUB 201–1), App. 131–150, 144–145.[1]

An October 2007 deadline was set for completion of these investigations. Memorandum from Joshua B. Bolten, Director, OMB, to the Heads of all Departments and Agencies (Aug. 5, 2005), App. 112. In January 2007, NASA modified its contract with Cal Tech to reflect the new background-check requirement. JPL management

_____

[1] As alternatives to the NACI process, the Department of Commerce also authorized federal agencies to use another "Office of Personnel Management . . . or National Security community investigation required for Federal employment." App. 145. None of these alternative background checks are at issue here.

informed employees that anyone failing to complete the
NACI process by October 2007 would be denied access to
JPL and would face termination by Cal Tech.

B

The NACI process has long been the standard back-
ground investigation for prospective civil servants. The
process begins when the applicant or employee fills out a
form questionnaire. Employees who work in "non-
sensitive" positions (as all respondents here do) complete
Standard Form 85 (SF–85). Office of Personnel Manage-
ment (OPM), Standard Form 85, Questionnaire for Non-
Sensitive Positions, App. 88–95.[2]

Most of the questions on SF–85 seek basic biographical
information: name, address, prior residences, education,
employment history, and personal and professional refer-
ences. The form also asks about citizenship, selective-
service registration, and military service. The last ques-
tion asks whether the employee has "used, possessed,
supplied, or manufactured illegal drugs" in the last year.
*Id.,* at 94. If the answer is yes, the employee must provide
details, including information about "any treatment or
counseling received." *Ibid.* A "truthful response," the
form notes, cannot be used as evidence against the em-
ployee in a criminal proceeding. *Ibid.* The employee must
certify that all responses on the form are true and must
sign a release authorizing the Government to obtain per-
sonal information from schools, employers, and others
during its investigation.

_____

[2] For public-trust and national-security positions, more detailed forms
are required. See OPM, Standard Form 85P, Questionnaire for Public
Trust Positions, online at http://www.opm.gov/Forms/pdf_fill/sf85p.pdf;
(all Internet materials as visited Jan. 13, 2011, and available in Clerk
of Court's case file); OPM, Standard Form 86, Questionnaire for
National Security Positions, online at http://www.opm.gov/Forms/
pdf_fill/sf86.pdf.

Once a completed SF–85 is on file, the "agency check" and "inquiries" begin. 75 Fed. Reg. 5359 (2010). The Government runs the information provided by the employee through FBI and other federal-agency databases. It also sends out form questionnaires to the former employers, schools, landlords, and references listed on SF–85. The particular form at issue in this case—the Investigative Request for Personal Information, Form 42—goes to the employee's former landlords and references. *Ibid.*[3]

Form 42 is a two-page document that takes about five minutes to complete. See *ibid.* It explains to the reference that "[y]our name has been provided by" a particular employee or applicant to help the Government determine that person's "suitability for employment or a security clearance." App. 96–97. After several preliminary questions about the extent of the reference's associations with the employee, the form asks if the reference has "any reason to question" the employee's "honesty or trustworthiness." *Id.,* at 97. It also asks if the reference knows of any "adverse information" concerning the employee's "violations of the law," "financial integrity," "abuse of alcohol and/or drugs," "mental or emotional stability," "general behavior or conduct," or "other matters." *Ibid.* If "yes" is checked for any of these categories, the form calls for an explanation in the space below. That space is also available for providing "additional information" ("derogatory" or "favorable") that may bear on "suitability for government employment or a security clearance." *Ibid.*

All responses to SF–85 and Form 42 are subject to the protections of the Privacy Act. The Act authorizes the Government to keep records pertaining to an individual

---

[3] The Government sends separate forms to employers (Form 41), educational institutions (Form 43), record repositories (Form 40), and law enforcement agencies (Form 44). 75 Fed. Reg. 5359. None of these forms are at issue here.

only when they are "relevant and necessary" to an end "required to be accomplished" by law. 5 U. S. C. §552a(e)(1). Individuals are permitted to access their records and request amendments to them. §§552a(d)(1),(2). Subject to certain exceptions, the Government may not disclose records pertaining to an individual without that individual's written consent. §552a(b).

C

About two months before the October 2007 deadline for completing the NACI, respondents brought this suit, claiming, as relevant here, that the background-check process violates a constitutional right to informational privacy. App. 82 (Complaint for Injunctive and Declaratory Relief).[4] The District Court denied respondents' motion for a preliminary injunction, but the Ninth Circuit granted an injunction pending appeal, 506 F. 3d 713 (2007), and later reversed the District Court's order. The court held that portions of both SF–85 and Form 42 are likely unconstitutional and should be preliminarily enjoined. 512 F. 3d 1134, vacated and superseded, 530 F. 3d 865 (2008).

Turning first to SF–85, the Court of Appeals noted respondents' concession "that most of the questions" on the form are "unproblematic" and do not "implicate the constitutional right to informational privacy." 530 F. 3d, at 878. But the court determined that the "group of questions concerning illegal drugs" required closer scrutiny. *Ibid.* Applying Circuit precedent, the court upheld SF–85's inquiries into recent involvement with drugs as "necessary to further the government's legitimate interest" in combating illegal-drug use. *Id.*, at 879. The court went on to hold, however, that the portion of the form requiring

—————
[4] Respondents sought to represent a class of "JPL employees in nonsensitive positions." App. 79. No class has been certified.

disclosure of drug "treatment or counseling" furthered no legitimate interest and was thus likely to be held unconstitutional. *Ibid.*

Form 42, in the Court of Appeals' estimation, was even "more problematic." *Ibid.* The form's "open-ended and highly private" questions, the court concluded, were not "narrowly tailored" to meet the Government's interests in verifying contractors' identities and "ensuring the security of the JPL." *Id.*, at 881, 880. As a result, the court held, these "open-ended" questions, like the drug-treatment question on SF–85, likely violate respondents' informational-privacy rights.[5]

Over the dissents of five judges, the Ninth Circuit denied rehearing en banc. 568 F. 3d 1028 (2009). We granted certiorari. 559 U. S. \_\_\_ (2010).

———————

[5] In the Ninth Circuit, respondents also challenged the criteria that they believe the Government will use to determine their "suitability" for employment at JPL. Respondents relied on a document, which had been temporarily posted on the JPL intranet, that listed factors purportedly bearing on suitability for federal employment. App. 98–104. Among the listed factors were a failure to "mee[t] financial obligations," "health issues," and "mental, emotional, psychological, or psychiatric issues." *Id.,* at 98, 102. Other factors, which were listed under the heading "Criminal or Immoral Conduct," included "indecent exposure," "voyeurism," "indecent proposal[s]," and "carnal knowledge." *Id.,* at 98. The document also stated that while "homosexuality," "adultery," and "illegitimate children" were not "suitability" issues in and of themselves, they might pose "security issue[s]" if circumstances indicated a "susceptibility to coercion or blackmail." *Id.,* at 102. The Court of Appeals rejected respondents' "challenges to . . . suitability determination[s]" as unripe. 530 F. 3d, at 873. Although respondents did not file a cross-petition from that portion of the Ninth Circuit's judgment, they nonetheless discuss these suitability criteria at some length in their brief before this Court. Respondents' challenge to these criteria is not before us. We note, however, the Acting Solicitor General's statement at oral argument that "NASA will not and does not use" the document to which respondents object "to make contractor credentialing decisions." Tr. of Oral Arg. 22.

II

As noted, respondents contend that portions of SF–85 and Form 42 violate their "right to informational privacy." Brief for Respondents 15. This Court considered a similar claim in *Whalen*, 429 U. S. 589, which concerned New York's practice of collecting "the names and addresses of all persons" prescribed dangerous drugs with both "legitimate and illegitimate uses." *Id.*, at 591. In discussing that claim, the Court said that "[t]he cases sometimes characterized as protecting 'privacy'" actually involved "at least two different kinds of interests": one, an "interest in avoiding disclosure of personal matters";[6] the other, an interest in "making certain kinds of important decisions" free from government interference.[7] The patients who brought suit in *Whalen* argued that New York's statute "threaten[ed] to impair" both their "nondisclosure" interests and their interests in making healthcare decisions independently. *Id.*, at 600. The Court, however, upheld the statute as a "reasonable exercise of New York's broad police powers." *Id.*, at 598.

*Whalen* acknowledged that the disclosure of "private information" to the State was an "unpleasant invasion of privacy," *id.*, at 602, but the Court pointed out that the New York statute contained "security provisions" that

_____

[6] 429 U. S., at 598–599, and n. 25 (citing *Olmstead* v. *United States*, 277 U. S. 438, 478 (1928) (Brandeis, J., dissenting) (describing "the right to be let alone" as "the right most valued by civilized men"); *Griswold* v. *Connecticut*, 381 U. S. 479, 483 (1965) ("[T]he First Amendment has a penumbra where privacy is protected from governmental intrusion"); *Stanley* v. *Georgia*, 394 U. S. 557, 559, 568 (1969); *California Bankers Assn.* v. *Shultz*, 416 U. S. 21, 79 (1974) (Douglas, J., dissenting); and *id.*, at 78 (Powell, J., concurring)).

[7] 429 U. S., at 599–600, and n. 26 (citing *Roe* v. *Wade*, 410 U. S. 113 (1973); *Doe* v. *Bolton*, 410 U. S. 179 (1973); *Loving* v. *Virginia*, 388 U. S. 1 (1967); *Griswold* v. *Connecticut, supra; Pierce* v. *Society of Sisters*, 268 U. S. 510 (1925); *Meyer* v. *Nebraska*, 262 U. S. 390 (1923); and *Allgeyer* v. *Louisiana*, 165 U. S. 587 (1897)).

protected against "public disclosure" of patients' informa-
tion, *id.*, at 600–601. This sort of "statutory or regulatory
duty to avoid unwarranted disclosures" of "accumulated
private data" was sufficient, in the Court's view, to protect
a privacy interest that "arguably ha[d] its roots in the
Constitution." *Id.*, at 605–606. The Court thus concluded
that the statute did not violate "any right or liberty pro-
tected by the Fourteenth Amendment." *Id.*, at 606.

Four months later, the Court referred again to a consti-
tutional "interest in avoiding disclosure." *Nixon,* 433
U. S., at 457 (internal quotation marks omitted). Former
President Nixon brought a challenge to the Presidential
Recordings and Materials Preservation Act, 88 Stat. 1695,
note following 44 U. S. C. §2111, a statute that required
him to turn over his presidential papers and tape re-
cordings for archival review and screening. 433 U. S., at
455–465. In a section of the opinion entitled "Privacy," the
Court addressed a combination of claims that the review
required by this Act violated the former President's
"Fourth and Fifth Amendmen[t]" rights. *Id.*, at 455, and
n. 18, 458–459. The Court rejected those challenges after
concluding that the Act at issue, like the statute in
*Whalen*, contained protections against "undue dissemina-
tion of private materials." 433 U. S., at 458. Indeed, the
Court observed that the former President's claim was
"weaker" than the one "found wanting . . . in *Whalen,*" as
the Government was required to return immediately all
"purely private papers and recordings" identified by the
archivists. *Id.*, at 458–459. Citing Fourth Amendment
precedent, the Court also stated that the public interest in
preserving presidential papers outweighed any "legitimate
expectation of privacy" that the former President may
have enjoyed. *Id.,* at 458 (citing *Katz* v. *United States*, 389
U. S. 347 (1967); *Camara* v. *Municipal Court of City and
County of San Francisco,* 387 U. S. 523 (1967); and *Terry*

v. *Ohio*, 392 U. S. 1 (1968)).[8]

The Court announced the decision in *Nixon* in the waning days of October Term 1976. Since then, the Court has said little else on the subject of an "individual interest in avoiding disclosure of personal matters." *Whalen*, *supra*, at 599; *Nixon*, *supra*, at 457. A few opinions have mentioned the concept in passing and in other contexts. See *Department of Justice* v. *Reporters Comm. for Freedom of Press*, 489 U. S. 749, 762–763 (1989); *New York* v. *Ferber*, 458 U. S. 747, 759, n. 10 (1982). But no other decision has squarely addressed a constitutional right to informational privacy.[9]

---

[8] The Court continued its discussion of Fourth Amendment principles throughout the "Privacy" section of the opinion. See 433 U. S., at 459 (citing *United States* v. *Miller*, 425 U. S. 435 (1976), *United States* v. *Dionisio*, 410 U. S. 1 (1973), and *Katz*, 389 U. S. 347)); 433 U. S., at 460–462 (addressing the former President's claim that the Act was "tantamount to a general warrant" under *Stanford* v. *Texas*, 379 U. S. 476 (1965)); 433 U. S., at 463–465, and n. 26 (concluding that the challenged law was analogous to the wiretapping provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, notwithstanding the lack of a "warrant requirement").

[9] State and lower federal courts have offered a number of different interpretations of *Whalen* and *Nixon* over the years. Many courts hold that disclosure of at least some kinds of personal information should be subject to a test that balances the government's interests against the individual's interest in avoiding disclosure. *E.g.*, *Barry* v. *New York*, 712 F. 2d 1554, 1559 (CA2 1983); *Fraternal Order of Police* v. *Philadelphia*, 812 F. 2d 105, 110 (CA3 1987); *Woodland* v. *Houston*, 940 F. 2d 134, 138 (CA5 1991) *(per curiam); In re Crawford*, 194 F. 3d 954, 959 (CA9 1999); *State* v. *Russo*, 259 Conn. 436, 459–464, 790 A. 2d 1132, 1147–1150 (2002). The Sixth Circuit has held that the right to informational privacy protects only intrusions upon interests "that can be deemed fundamental or implicit in the concept of ordered liberty." *J. P.* v. *DeSanti*, 653 F. 2d 1080, 1090 (1981) (internal quotation marks omitted). The D. C. Circuit has expressed "grave doubts" about the existence of a constitutional right to informational privacy. *American Federation of Govt. Employees* v. *HUD*, 118 F. 3d 786, 791 (1997).

Opinion of the Court

## III

As was our approach in *Whalen*, we will assume for present purposes that the Government's challenged inquiries implicate a privacy interest of constitutional significance.  429 U. S., at 599, 605.[10]  We hold, however,

---

[10] The opinions concurring in the judgment disagree with this approach and would instead provide a definitive answer to the question whether there is a constitutional right to informational privacy.  *Post*, at 6–7 (opinion of SCALIA, J.); *post*, at 1 (opinion of THOMAS, J.).  One of these opinions expresses concern that our failure to do so will "har[m] our image, if not our self-respect," *post,* at 7 (SCALIA, J.), and will cause practical problems, *post,* at 8–9.  There are sound reasons for eschewing the concurring opinions' recommended course.

"The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."  *Carducci* v. *Regan*, 714 F. 2d 171, 177 (CADC 1983) (opinion for the court by Scalia, J.).  In this case, petitioners did not ask us to hold that there is no constitutional right to informational privacy, and respondents and their *amici* thus understandably refrained from addressing that issue in detail.  It is undesirable for us to decide a matter of this importance in a case in which we do not have the benefit of briefing by the parties and in which potential *amici* had little notice that the matter might be decided.   See Pet. for Cert. 15 ("no need in this case" for broad decision on "the scope of a constitutionally-based right to privacy for certain information").  Particularly in cases like this one, where we have only the "scarce and open-ended" guideposts of substantive due process to show us the way, see *Collins* v. *Harker Heights*, 503 U. S. 115, 125 (1992), the Court has repeatedly recognized the benefits of proceeding with caution.  *E.g.*, *Herrera* v. *Collins*, 506 U. S. 390, 417 (1993) (joined by SCALIA, J.) (assuming "for the sake of argument . . . that in a capital case a truly persuasive demonstration of 'actual innocence'" made after conviction would render execution unconstitutional); *Cruzan* v. *Director, Mo. Dept. of Health*, 497 U. S. 261, 279 (1990) (joined by SCALIA, J.) ("[W]e assume that the United States Constitution would grant a competent person a constitutionally protected right to refuse lifesaving hydration and nutrition"); *Regents of Univ. of Mich.* v. *Ewing*, 474 U. S. 214, 222–223 (1985) ("assum[ing], without deciding, that federal courts can review an academic decision of a public educational institution under a substantive due process standard"); *Board of Curators of Univ. of Mo.* v. *Horowitz*, 435 U. S. 78, 91–

that, whatever the scope of this interest, it does not prevent the Government from asking reasonable questions of the sort included on SF–85 and Form 42 in an employment background investigation that is subject to the Privacy Act's safeguards against public disclosure.

## A

### 1

As an initial matter, judicial review of the Government's challenged inquiries must take into account the context in which they arise. When the Government asks respondents and their references to fill out SF–85 and Form 42, it does not exercise its sovereign power "to regulate or license." *Cafeteria & Restaurant Workers* v. *McElroy*, 367 U. S. 886, 896 (1961). Rather, the Government conducts the challenged background checks in its capacity "as proprietor" and manager of its "internal operation." *Ibid.* Time and again our cases have recognized that the Government has a much freer hand in dealing "with citizen employees than it does when it brings its sovereign power to bear on citizens at large." *Engquist* v. *Oregon Dept. of Agriculture*, 553 U. S. 591, 598 (2008); *Waters* v. *Churchill*, 511 U. S. 661, 674 (1994) (plurality opinion). This distinction is grounded on the "common-sense realization" that if

——————

92 (1978) (same); see also *New York State Club Assn., Inc.* v. *City of New York*, 487 U. S. 1, 20 (1988) (SCALIA, J., concurring in part and concurring in judgment) (joining the Court's opinion on the understanding that it "assumes for purposes of its analysis, but does not hold, the existence of a constitutional right of private association for other than expressive or religious purposes").

Justice SCALIA provides no support for his claim that our approach in this case will "dramatically increase the number of lawsuits claiming violations of the right to informational privacy," *post*, at 9, and will leave the lower courts at sea. We take the same approach here that the Court took more than three decades ago in *Whalen* and *Nixon*, and there is no evidence that those decisions have caused the sky to fall.

We therefore decide the case before us and leave broader issues for another day.

every "employment decision became a constitutional mat-
ter," the Government could not function. See *Connick* v.
*Myers*, 461 U. S. 138, 143 (1983); see also *Bishop* v. *Wood*,
426 U. S. 341, 350 (1976) ("The Due Process Clause . . . is
not a guarantee against incorrect or ill-advised personnel
decisions").

An assessment of the constitutionality of the challenged
portions of SF–85 and Form 42 must account for this
distinction. The questions challenged by respondents are
part of a standard employment background check of the
sort used by millions of private employers. See Brief for
Consumer Data Indus. Assn. et al. as *Amici Curiae* 2
(hereinafter CDIA Brief) ("[M]ore than 88% of U. S.
companies . . . perform background checks on their em-
ployees"). The Government itself has been conducting
employment investigations since the earliest days of the
Republic. L. White, The Federalists: A Study in Adminis-
trative History 262–263 (1948); see OPM, Biography of An
Ideal: History of the Federal Civil Service 8 (2002) (noting
that President Washington "set a high standard" for fed-
eral office and finalized appointments only after "investi-
gating [candidates'] capabilities and reputations"). Since
1871, the President has enjoyed statutory authority to
"ascertain the fitness of applicants" for the civil service "as
to age, health, character, knowledge and ability for the
employment sought," Act of Mar. 3, 1871, Rev. Stat. §1753,
as amended, 5 U. S. C. §3301(2), and that Act appears to
have been regarded as a codification of established prac-
tice.[11] Standard background investigations similar to those

––––––––

[11] The debate on the 1871 Act in the House of Representatives con-
tained this exchange on presidential authority to conduct background
checks:

"Mr. PETERS: Has he not that power [to conduct the proposed investi-
gations of candidates for the civil service] now?

"Mr. DAWES: He has all that power. If you will go up to the War
Department or the Department of the Interior you will see pretty much

at issue here became mandatory for all candidates for the federal civil service in 1953. Exec. Order No. 10450, 3 CFR 936. And the particular investigations challenged in this case arose from a decision to extend that requirement to federal contract employees requiring long-term access to federal facilities. See HSPD–12, at 1765, App. 127; FIPS PUB 201–1, at iii–vi, 1–8, App. 131–150.

As this long history suggests, the Government has an interest in conducting basic employment background checks. Reasonable investigations of applicants and employees aid the Government in ensuring the security of its facilities and in employing a competent, reliable workforce. See *Engquist, supra*, at 598–599. Courts must keep those interests in mind when asked to go line-by-line through the Government's employment forms and to scrutinize the choice and wording of the questions they contain.

Respondents argue that, because they are contract employees and not civil servants, the Government's broad authority in managing its affairs should apply with diminished force. But the Government's interest as "proprietor" in managing its operations, *Cafeteria & Restaurant Workers, supra*, at 896, does not turn on such formalities. See *Board of Comm'rs, Wabaunsee Cty.* v. *Umbehr*, 518 U. S. 668, 678, 679 (1996) (formal distinctions such as whether a "service provider" has a "contract of employment or a contract for services" with the government is a "very poor proxy" for constitutional interests at stake). The fact that respondents' direct employment relationship is with Cal Tech—which operates JPL under a Government contract—says very little about the interests at stake in this case. The record shows that, as a "practical matter," there are no "[r]elevant distinctions" between the duties per-

—————
all of this nailed up on the doors, in the form of rules and regulations." Cong. Globe, 41st Cong., 3d Sess., 1935 (1871).

formed by NASA's civil-service workforce and its contractor workforce. App. 221. The two classes of employees perform "functionally equivalent duties," and the extent of employees' "access to NASA . . . facilities" turns not on formal status but on the nature of "the jobs they perform." *Ibid.*

At JPL, in particular, the work that contract employees perform is critical to NASA's mission. Respondents in this case include "the lead trouble-shooter for . . . th[e] $568 [million]" Kepler space observatory, 7 Record 396; the leader of the program that "tests . . . all new technology that NASA will use in space," App. 60; and one of the lead "trajectory designers for . . . the Galileo Project and the Apollo Moon landings," *id.,* at 62. This is important work, and all of it is funded with a multibillion dollar investment from the American taxpayer. See NASA, Jet Propulsion Laboratory Annual Report 09, p. 35 (2010), online at http://www.jpl.nasa.gov/annualreport/2009-report.pdf. The Government has a strong interest in conducting basic background checks into the contract employees minding the store at JPL.[12]

———————

[12] In their brief, respondents also rely on the fact that many of them have been working at JPL for years and that Cal Tech previously vetted them through standard "employment reference checks." Brief for Respondents 52–53. The record indicates that this may be wrong as a factual matter. *E.g.*, 7 Record 391 ("I have not been required to undergo any type of background investigation to maintain my position with JPL"); *id.,* at 397 ("I have never been required to undergo any type of background investigation to maintain my position with JPL other than . . . [one] which required that I provide my name, social security number, and current address" to facilitate a "check for outstanding warrants, arrests, or convictions"); *id.*, at 356, 367, 386–387 (similar). Even if it were correct, the fact that Cal Tech once conducted a background check on respondents does not diminish the Government's interests in conducting its own standard background check to satisfy itself that contract employees should be granted continued access to the Government's facility. In any event, counsel abandoned this position at oral argument. Tr. of Oral Arg. 38.

2

With these interests in view, we conclude that the challenged portions of both SF–85 and Form 42 consist of reasonable, employment-related inquiries that further the Government's interests in managing its internal operations. See *Engquist*, 553 U. S., at 598–599; *Whalen,* 429 U. S., at 597–598. As to SF–85, the only part of the form challenged here is its request for information about "any treatment or counseling received" for illegal-drug use within the previous year. The "treatment or counseling" question, however, must be considered in context. It is a followup to SF–85's inquiry into whether the employee has "used, possessed, supplied, or manufactured illegal drugs" during the past year. The Government has good reason to ask employees about their recent illegal-drug use. Like any employer, the Government is entitled to have its projects staffed by reliable, law-abiding persons who will "'efficiently and effectively'" discharge their duties. See *Engquist, supra*, at 598–599. Questions about illegal-drug use are a useful way of figuring out which persons have these characteristics. See, *e.g.*, Breen & Matusitz, An Updated Examination of the Effects of Illegal Drug Use in the Workplace, 19 J. Human Behavior in the Social Environment, 434 (2009) (illicit drug use negatively correlated with workplace productivity).

In context, the follow-up question on "treatment or counseling" for recent illegal-drug use is also a reasonable, employment-related inquiry. The Government, recognizing that illegal-drug use is both a criminal and a medical issue, seeks to separate out those illegal-drug users who are taking steps to address and overcome their problems. The Government thus uses responses to the "treatment or counseling" question as a mitigating factor in determining whether to grant contract employees long-term access to

federal facilities.[13]

This is a reasonable, and indeed a humane, approach, and respondents do not dispute the legitimacy of the Government's decision to use drug treatment as a mitigating factor in its contractor credentialing decisions. Respondents' argument is that, if drug treatment is only used to mitigate, then the Government should change the mandatory phrasing of SF–85—"Include [in your answer] any treatment or counseling received"—so as to make a response optional. App. 94. As it stands, the mandatory "treatment or counseling" question is unconstitutional, in respondents' view, because it is "more intrusive than necessary to satisfy the government's objective." Brief for Respondents 26; 530 F. 3d, at 879 (holding that "treatment or counseling" question should be enjoined because the form "appears to *compel* disclosure").

We reject the argument that the Government, when it requests job-related personal information in an employment background check, has a constitutional burden to demonstrate that its questions are "necessary" or the least restrictive means of furthering its interests. So exacting a standard runs directly contrary to *Whalen*. The patients in *Whalen*, much like respondents here, argued that New York's statute was unconstitutional because the State could not "demonstrate the necessity" of its program. 429 U. S., at 596. The Court quickly rejected that argument, concluding that New York's collection of patients' prescription information could "not be held unconstitutional simply because" a court viewed it as "unnecessary, in whole or

———————

[13] Asking about treatment or counseling could also help the Government identify chronic drug abusers for whom, "despite counseling and rehabilitation programs, there is little chance for effective rehabilitation." 38 Fed. Reg. 33315 (1973). At oral argument, however, the Acting Solicitor General explained that NASA views treatment or counseling solely as a "mitigat[ing]" factor that ameliorates concerns about recent illegal drug use. Tr. of Oral Arg. 19.

in part." *Id.,* at 596–597.

That analysis applies with even greater force where the Government acts, not as a regulator, but as the manager of its internal affairs. See *Engquist*, *supra*, at 598–599. SF–85's "treatment or counseling" question reasonably seeks to identify a subset of acknowledged drug users who are attempting to overcome their problems. The Government's considered position is that phrasing the question in more permissive terms would result in a lower response rate, and the question's effectiveness in identifying illegal-drug users who are suitable for employment would be "materially reduced." Reply Brief for Petitioners 19. That is a reasonable position, falling within the "'wide latitude'" granted the Government in its dealings with employees. See *Engquist*, *supra*, at 600.

3

The Court of Appeals also held that the broad, "open-ended questions" on Form 42 likely violate respondents' informational-privacy rights. Form 42 asks applicants' designated references and landlords for "information" bearing on "suitability for government employment or a security clearance." App. 97. In a series of questions, the Government asks if the reference has any "adverse information" about the applicant's "honesty or trustworthiness," "violations of the law," "financial integrity," "abuse of alcohol and/or drugs," "mental or emotional stability," "general behavior or conduct," or "other matters." *Ibid.*

These open-ended inquiries, like the drug-treatment question on SF–85, are reasonably aimed at identifying capable employees who will faithfully conduct the Government's business. See *Engquist*, *supra*, at 598–599. Asking an applicant's designated references broad, open-ended questions about job suitability is an appropriate tool for separating strong candidates from weak ones. It would be a truly daunting task to catalog all the reasons why a

person might not be suitable for a particular job, and references do not have all day to answer a laundry list of specific questions. See CDIA Brief 6–7 (references "typically have limited time to answer questions from potential employers," and "open-ended questions" yield more relevant information than narrow inquiries). Form 42, by contrast, takes just five minutes to complete. 75 Fed. Reg. 5359.

The reasonableness of such open-ended questions is illustrated by their pervasiveness in the public and private sectors. Form 42 alone is sent out by the Government over 1.8 million times annually. *Ibid.* In addition, the use of open-ended questions in employment background checks appears to be equally commonplace in the private sector. See, *e.g.*, S. Bock et al., Mandated Benefits 2008 Compliance Guide, Exh. 20.1, A Sample Policy on Reference Checks on Job Applicants ("Following are the guidelines for conducting a telephone reference check: . . . Ask open-ended questions, then wait for the respondent to answer"); M. Zweig, Human Resources Management 87 (1991) ("Also ask, 'Is there anything else I need to know about [candidate's name]?' This kind of open-ended question may turn up all kinds of information you wouldn't have gotten any other way"). The use of similar open-ended questions by the Government is reasonable and furthers its interests in managing its operations.

B

1

Not only are SF–85 and Form 42 reasonable in light of the Government interests at stake, they are also subject to substantial protections against disclosure to the public. Both *Whalen* and *Nixon* recognized that government "accumulation" of "personal information" for "public purposes" may pose a threat to privacy. *Whalen*, 429 U. S., at 605; see *Nixon* 433 U. S., at 457–458, 462. But both deci-

sions also stated that a "statutory or regulatory duty to avoid unwarranted disclosures" generally allays these privacy concerns. *Whalen*, *supra*, at 605; *Nixon*, *supra,* at 458–459. The Court in *Whalen*, relying on New York's "security provisions" prohibiting public disclosure, turned aside a challenge to the collection of patients' prescription information. 429 U. S., at 594, and n. 12, 600–601, 605. In *Nixon,* the Court rejected what it regarded as an even "weaker" claim by the former President because the Presidential Recordings and Materials Preservation Act "[n]ot only . . . mandate[d] regulations" against "undue dissemination," but also required immediate return of any "purely private" materials flagged by the Government's archivists. 433 U. S., at 458–459.

Respondents in this case, like the patients in *Whalen* and former President Nixon, attack only the Government's *collection* of information on SF–85 and Form 42. And here, no less than in *Whalen* and *Nixon*, the information collected is shielded by statute from "unwarranted disclosur[e]." See *Whalen*, *supra,* at 605. The Privacy Act, which covers all information collected during the background-check process, allows the Government to maintain records "about an individual" only to the extent the records are "relevant and necessary to accomplish" a purpose authorized by law. 5 U. S. C. §552a(e)(1). The Act requires written consent before the Government may disclose records pertaining to any individual. §552a(b). And the Act imposes criminal liability for willful violations of its nondisclosure obligations. §552a(i)(1). These requirements, as we have noted, give "forceful recognition" to a Government employee's interest in maintaining the "confidentiality of sensitive information . . . in his personnel files." *Detroit Edison Co.* v. *NLRB*, 440 U. S. 301, 318, n. 16 (1979). Like the protections against disclosure in *Whalen* and *Nixon*, they "evidence a proper concern" for individual privacy. *Whalen*, *supra*, at 605; *Nixon*, *supra*,

at 458–459.

2

Notwithstanding these safeguards, respondents argue that statutory exceptions to the Privacy Act's disclosure bar, see §§552a(b)(1)–(12), leave its protections too porous to supply a meaningful check against "unwarranted disclosures," *Whalen*, *supra*, at 605. Respondents point in particular to what they describe as a "broad" exception for "routine use[s]," defined as uses that are "compatible with the purpose for which the record was collected." §§552a(b)(3), (a)(7).

Respondents' reliance on these exceptions rests on an incorrect reading of both our precedents and the terms of the Privacy Act. As to our cases, the Court in *Whalen* and *Nixon* referred approvingly to statutory or regulatory protections against "*unwarranted* disclosures" and "*undue* dissemination" of personal information collected by the Government. *Whalen*, *supra*, at 605; *Nixon*, *supra*, at 458. Neither case suggested that an ironclad disclosure bar is needed to satisfy privacy interests that may be "root[ed] in the Constitution." *Whalen*, *supra*, at 605. In *Whalen*, the New York statute prohibiting "[p]ublic disclosure of the identity of patients" was itself subject to several exceptions. 429 U. S., at 594–595, and n. 12. In *Nixon*, the protections against "undue dissemination" mentioned in the opinion were not even before the Court, but were to be included in forthcoming regulations "mandate[d]" by the challenged Act. 433 U. S., at 458; see *id.*, at 437–439 (explaining that the Court was limiting its review to the Act's "facial validity" and was not considering the Administrator's forthcoming regulations). Thus, the mere fact that the Privacy Act's nondisclosure requirement is subject to exceptions does not show that the statute provides insufficient protection against public disclosure.

Nor does the substance of the "routine use" exception

relied on by respondents create any undue risk of public dissemination. None of the authorized "routine use[s]" of respondents' background-check information allows for release to the public. 71 Fed. Reg. 45859–45860, 45862 (2006); 60 Fed. Reg. 63084 (1995), as amended, 75 Fed. Reg. 28307 (2010). Rather, the established "routine use[s]" consist of limited, reasonable steps designed to complete the background-check process in an efficient and orderly manner. See *Whalen*, *supra*, at 602 (approving disclosures to authorized New York Department of Health employees that were not "meaningfully distinguishable" from routine disclosures "associated with many facets of health care"). One routine use, for example, involves a limited disclosure to persons filling out Form 42 so that designated references can "identify the individual" at issue and can understand the "nature and purpose of the investigation." App. 89. Authorized JPL employees also review each completed SF–85 to verify that all requested information has been provided. *Id.,* at 211. These designated JPL employees may not "disclose any information contained in the form to anyone else," *ibid.*, and Cal Tech is not given access to adverse information uncovered during the Government's background check, *id.,* at 207–208. The "remote possibility" of public disclosure created by these narrow "routine use[s]" does not undermine the Privacy Act's substantial protections. See *Whalen*, 429 U. S., at 601–602 ("remote possibility" that statutory security provisions will "provide inadequate protection against unwarranted disclosures" not a sufficient basis for striking down statute).

Citing past violations of the Privacy Act,[14] respondents

––––––––

[14] *E.g.*, GAO, Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent Is Unknown 5, 20 (GAO 07–737, 2007) (over 3-year period, 788 data breaches occurred at 17 federal agencies).

note that it is possible that their personal information could be disclosed as a result of a similar breach. But data breaches are a possibility any time the Government stores information. As the Court recognized in *Whalen*, the mere possibility that security measures will fail provides no "proper ground" for a broad-based attack on government information-collection practices. *Ibid.* Respondents also cite a portion of SF–85 that warns of possible disclosure "[t]o the news media or the general public." App. 89. By its terms, this exception allows public disclosure only where release is "in the public interest" and would not result in "an unwarranted invasion of personal privacy." *Ibid.* Respondents have not cited any example of such a disclosure, nor have they identified any plausible scenario in which their information might be unduly disclosed under this exception.[15]

In light of the protection provided by the Privacy Act's nondisclosure requirement, and because the challenged portions of the forms consist of reasonable inquiries in an employment background check, we conclude that the Government's inquiries do not violate a constitutional right to informational privacy. *Whalen*, *supra*, at 605.

\*　　\*　　\*

For these reasons, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

───────────

[15] Respondents further contend that the Privacy Act's ability to deter unauthorized release of private information is significantly hampered by the fact that the statute provides only "an *ex post* money-damages action," not injunctive relief. Brief for Respondents 44 (citing *Doe* v. *Chao*, 540 U. S. 614, 635 (2004) (GINSBURG, J., dissenting)). Nothing in *Whalen* or *Nixon* suggests that any private right of action—for money damages or injunctive relief—is needed in order to provide sufficient protection against public disclosure.

JUSTICE KAGAN took no part in the consideration or decision of this case.

# SUPREME COURT OF THE UNITED STATES

No. 09–530

NATIONAL AERONAUTICS AND SPACE ADMIN-
ISTRATION, ET AL., PETITIONERS *v.*
ROBERT M. NELSON ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 19, 2011]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins,
concurring in the judgment.

I agree with the Court, of course, that background
checks of employees of government contractors do not
offend the Constitution. But rather than reach this con-
clusion on the basis of the never-explained assumption
that the Constitution requires courts to "balance" the
Government's interests in data collection against its con-
tractor employees' interest in privacy, I reach it on simpler
grounds. Like many other desirable things not included
in the Constitution, "informational privacy" seems like a
good idea—wherefore the People have enacted laws at the
federal level and in the states restricting the government's
collection and use of information. But it is up to the Peo-
ple to enact those laws, to shape them, and, when they
think it appropriate, to repeal them. A federal constitu-
tional right to "informational privacy" does not exist.

Before addressing the constitutional issues, however, I
must observe a remarkable and telling fact about this
case, unique in my tenure on this Court: Respondents'
brief, in arguing that the Federal Government violated the
Constitution, does not once identify which provision of
the Constitution that might be. The Table of Authorities
contains citations of cases from federal and state courts,

federal and state statutes, Rules of Evidence from four states, two Executive Orders, a House Report, and even more exotic sources of law, such as two reports of the Government Accountability Office and an EEOC document concerning "Enforcement Guidance." And yet it contains not a single citation of the sole document we are called upon to construe: the Constitution of the United States. The body of the brief includes a single, fleeting reference to the Due Process Clause, buried in a citation of the assuredly inapposite *Lawrence* v. *Texas*, 539 U. S. 558 (2003), Brief for Respondents 42; but no further attempt is made to argue that NASA's actions deprived respondents of liberty without due process of law. And this legal strategy was not limited to respondents' filing in this Court; in the Ninth Circuit respondents asserted in a footnote that "courts have grounded the right to informational privacy in various provisions of the Constitution," Brief for Appellants in No. 07–56424, p. 25, n. 18, but declined to identify which ones applied here.

To tell the truth, I found this approach refreshingly honest. One who asks us to invent a constitutional right out of whole cloth should spare himself and us the pretense of tying it to some words of the Constitution. Regrettably, this Lincolnesque honesty evaporated at oral argument, when counsel asserted, apparently for the first time in this litigation, that the right to informational privacy emerged from the Due Process Clause of the Fifth Amendment. Tr. of Oral Arg. 28–29. That counsel invoked the infinitely plastic concept of "substantive" due process does not make this constitutional theory any less invented.

This case is easily resolved on the simple ground that the Due Process Clause does not "guarante[e] certain (unspecified) liberties"; rather, it "merely guarantees certain procedures as a prerequisite to deprivation of liberty." *Albright* v. *Oliver*, 510 U. S. 266, 275 (1994)

(SCALIA, J., concurring).  Respondents make no claim that
the State has deprived them of liberty without the requi-
site procedures, and their due process claim therefore
must fail.  Even under the formula we have adopted for
identifying liberties entitled to protection under the faux
"substantive" component of the Due Process Clause—that
"the Due Process Clause specially protects those funda-
mental rights and liberties which are, objectively, deeply
rooted in this Nation's history and tradition," *Washington*
v. *Glucksberg*, 521 U. S. 702, 720–721 (1997) (internal
quotation marks omitted)—respondents' claim would fail.
Respondents do not even attempt to argue that the claim
at issue in this case passes that test, perhaps recognizing
the farcical nature of a contention that a right deeply
rooted in our history and tradition bars the Government
from ensuring that the Hubble Telescope is not used by
recovering drug addicts.

   The absurdity of respondents' position in this case
should not, however, obscure the broader point: Our due
process precedents, even our "substantive due process"
precedents, do not support *any* right to informational
privacy.  First, we have held that the government's act of
defamation does not deprive a person "of any 'liberty'
protected by the procedural guarantees of the Fourteenth
Amendment."  *Paul* v. *Davis*, 424 U. S. 693, 709 (1976).
We reasoned that stigma, standing alone, does not "sig-
nificantly alte[r]" a person's legal status so as to "justif[y]
the invocation of procedural safeguards."  *Id.,* at 708–709.
If outright defamation does not qualify, it is unimaginable
that the mere disclosure of private information does.

   Second, respondents challenge the Government's *collec-
tion* of their private information.  But the Government's
collection of private information is regulated by the Fourth
Amendment, and "[w]here a particular Amendment pro-
vides an explicit textual source of constitutional protection
against a particular sort of government behavior, that

Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *County of Sacramento* v. *Lewis*, 523 U. S. 833, 842 (1998) (internal quotation marks omitted; alteration in original). Here, the Ninth Circuit rejected respondents' Fourth Amendment argument, correctly holding that the Form 42 inquiries to third parties were not Fourth Amendment "searches" under *United States* v. *Miller*, 425 U. S. 435 (1976), and that the Fourth Amendment does not prohibit the Government from asking questions about private information. 530 F. 3d 865, 876–877 (2008). That should have been the end of the matter. Courts should not use the Due Process Clause as putty to fill up gaps they deem unsightly in the protections provided by other constitutional provisions.

In sum, I would simply hold that there is no constitutional right to "informational privacy." Besides being consistent with constitutional text and tradition, this view has the attractive benefit of resolving this case without resort to the Court's exegesis on the Government's legitimate interest in identifying contractor drug abusers and the comfortingly narrow scope of NASA's "routine use" regulations. I shall not fill the U. S. Reports with further explanation of the incoherence of the Court's "substantive due process" doctrine in its many manifestations, since the Court does not play the substantive-due-process card. Instead, it states that it will "assume, without deciding" that there exists a right to informational privacy, *ante*, at 1.

The Court's sole justification for its decision to "assume, without deciding" is that the Court made the same mistake before—in two 33-year-old cases, *Whalen* v. *Roe*, 429 U. S. 589 (1977), and *Nixon* v. *Administrator of General Services*, 433 U. S. 425 (1977).* *Ante*, at 11. But *stare*

──────────

*Contrary to the Court's protestation, *ante*, at 11, n. 10, the Court's

*decisis* is simply irrelevant when the pertinent precedent assumed, without deciding, the existence of a constitutional right. "*Stare decisis* reflects a policy judgment that in most matters it is more important that the applicable rule of law be settled than that it be settled right." *State Oil Co.* v. *Khan*, 522 U. S. 3, 20 (1997) (internal quotation marks omitted). "It is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles." *Ibid.* (internal quotation marks omitted). Here, however, there *is* no applicable rule of law that is settled. To the contrary, *Whalen* and *Nixon* created an uncertainty that the text of the Constitution did not contain and that today's opinion perpetuates.

A further reason *Whalen* and *Nixon* are not entitled to *stare decisis* effect is that neither opinion supplied any coherent reason why a constitutional right to informational privacy might exist. As supporting authority, *Whalen* cited *Stanley* v. *Georgia*, 394 U. S. 557 (1969), a

--------

failure to address whether there is a right to informational privacy cannot be blamed upon the Government's concession that such a right exists, and indeed the Government's startling assertion that *Whalen* and *Nixon* (which decided nothing on the constitutional point, and have not been so much as cited in our later opinions) were "seminal"—*seminal!*—decisions. Reply Brief for Petitioner 22. We are not bound by a litigant's concession on an issue of law. See, *e.g., Grove City College* v. *Bell*, 465 U. S. 555, 562, n. 10 (1984). And it should not be thought that the concession by the United States is an entirely self-denying act. To be sure, it subjects the Executive Branch to constitutional limitations on the collection and use of information; but the Privacy Act, 5 U. S. C. §552a (2006 ed. and Supp. III), already contains extensive limitations not likely to be surpassed by constitutional improvisation. And because Congress's power under §5 of the Fourteenth Amendment extends to the full scope of the Due Process Clause, see *City of Boerne* v. *Flores*, 521 U. S. 507 (1997), the United States has an incentive to give that Clause a broad reading, thus expanding the scope of federal legislation that it justifies. Federal laws preventing state disregard of "informational privacy" may be a twinkle in the Solicitor General's eye.

First Amendment case protecting private possession of obscenity; the deservedly infamous dictum in *Griswold* v. *Connecticut*, 381 U. S. 479 (1965), concerning the "penumbra" of the First Amendment; and three concurring or dissenting opinions, none of which remotely intimated that there might be such a thing as a substantive due process right to informational privacy. 429 U. S., at 599, n. 25. *Nixon* provided even less support. After citing the observation in *Whalen* that "[o]ne element of privacy has been characterized as the individual interest in avoiding disclosure of personal matters," *Nixon*, *supra*, at 457 (quoting *Whalen*, *supra*, at 599; internal quotation marks omitted), it proceeded to conduct a straightforward *Fourth Amendment* analysis. It "assume[d]" that there was a "legitimate expectation of privacy" in the materials, and rejected the appellant's argument that the statute at issue was "precisely the kind of abuse that the Fourth Amendment was intended to prevent." *Nixon*, *supra*, at 457–458, 460. It is unfathomable why these cases' passing, barely explained reference to a right separate from the Fourth Amendment—an unenumerated right that they held to be *not* applicable—should be afforded *stare decisis* weight.

At this point the reader may be wondering: "What, after all, is the harm in being 'minimalist' and simply refusing to say that violation of a constitutional right of informational privacy can never exist? The outcome in this case is the same, so long as the Court holds that any such hypothetical right was not violated." Well, there is harm. The Court's never-say-never disposition does damage for several reasons.

1. It is in an important sense not actually minimalist. By substituting for one real constitutional question (whether there exists a constitutional right to informational privacy) a different constitutional question (whether NASA's background checks would contravene a right to informational privacy if such a right existed), the Court

gets to pontificate upon a matter that is none of its business: the appropriate balance between security and privacy. If I am correct that there exists no right to informational privacy, all that discussion is an exercise in judicial *maximalism*. Better simply to state and apply the law forthrightly than to hold our view of the law *in pectore*, so that we can inquire into matters beyond our charter, and probably beyond our ken.

If, on the other hand, the Court believes that there *is* a constitutional right to informational privacy, then I fail to see the minimalist virtues in delivering a lengthy opinion analyzing that right while coyly noting that the right is "assumed" rather than "decided." Thirty-three years have passed since the Court first suggested that the right may, or may not, exist. It is past time for the Court to abandon this Alfred Hitchcock line of our jurisprudence.

2. It harms our image, if not our self-respect, because it makes no sense. The Court decides that the Government did not violate the right to informational privacy without deciding whether there *is* a right to informational privacy, and without even describing what hypothetical standard should be used to assess whether the hypothetical right has been violated. As I explained last Term in objecting to another of the Court's never-say-never dispositions:

> "[The Court] cannot decide that [respondents'] claim fails without first deciding what a valid claim would consist of. . . . [A]greeing to or crafting a *hypothetical* standard for a *hypothetical* constitutional right is sufficiently unappealing . . . that [the Court] might as well acknowledge the right as well. Or [it] could avoid the need to agree with or craft a hypothetical standard by *denying* the right. But embracing a standard while being coy about the right is, well, odd; and deciding this case while addressing *neither* the standard *nor* the right is quite impossible." *Stop the Beach Re-*

> *nourishment, Inc.* v. *Florida Dept. of Environmental Protection*, 560 U. S. \_\_\_, \_\_\_ (2010) (plurality opinion) (joined by ALITO, J.) (slip op., at 12–13).

Whatever the virtues of judicial minimalism, it cannot justify judicial incoherence.

The Court defends its approach by observing that "we have only the 'scarce and open-ended'" guideposts of substantive due process to show us the way." *Ante*, at 11, n. 10. I would have thought that this doctrinal obscurity should lead us to provide *more* clarity for lower courts; surely one vague opinion should not provide an excuse for another.

The Court observes that I have joined other opinions that have assumed the existence of constitutional rights. *Ibid.* It is of course acceptable to reserve difficult constitutional questions, so long as answering those questions is unnecessary to coherent resolution of the issue presented in the case. So in *Cruzan* v. *Director, Mo. Dept. of Health,* 497 U. S. 261, 279–280 (1990), we declined to decide whether a competent person had a constitutional right to refuse lifesaving hydration, because—under a constitutional standard we laid out in detail—such a right did not exist for an incompetent person. In *Herrera* v. *Collins,* 506 U. S. 390, 417–418 (1993), we declined to decide whether it would be unconstitutional to execute an innocent person, because Herrera had not shown that he was innocent. In *New York State Club Assn.*, *Inc.* v. *City of New York,* 487 U. S. 1, 10–15 (1988), we declined to decide whether there was a constitutional right of private association for certain clubs, because the plaintiff had brought a facial challenge, which would fail if the statute was valid in many of its applications, making it unnecessary to decide whether an as-applied challenge as to some clubs could succeed. Here, however, the Court actually *applies* a constitutional informational privacy standard without

giving a clue as to the rule of law it is applying.

　3. It provides no guidance whatsoever for lower courts. Consider the sheer multiplicity of unweighted, relevant factors alluded to in today's opinion:

- It is relevant that the Government is acting "in its capacity 'as proprietor' and manager of its 'internal operation.'" *Ante*, at 12. Of course, given that we are told neither what the appropriate standard should be when the Government is acting as regulator nor what the appropriate standard should be when it is acting as proprietor, it is not clear *what* effect this fact has on the analysis; but at least we know that it is *something*.

- History and tradition have some role to play, *ante*, at 13–14, but how much is uncertain. The Court points out that the Federal Government has been conducting investigations of candidates for employment since the earliest days; but on the other hand it acknowledges that extension of those investigations to employees of contractors is of very recent vintage.

- The contract employees are doing important work. They are not mere janitors and maintenance men; they are working on a $568 million observatory. *Ante*, at 15. Can it possibly be that the outcome of today's case would be different for background checks of lower-level employees? In the spirit of minimalism we are never told.

- Questions about drug treatment are (hypothetically) constitutional because they are "reasonable," "useful," and "humane." *Ante*, at 16–17 (internal quotation marks omitted). And questions to third parties are constitutional because they are "appropriate" and "pervasiv[e]." *Ante*, at 18–19. Any or all of these adjectives may be the hypothetical standard by which violation of the hypothetical constitutional right to "informational privacy" is evaluated.

- The Court notes that a "'statutory or regulatory duty
  to avoid unwarranted disclosures' *generally* allays
  these privacy concerns," *ante,* at 20 (emphasis added),
  but it gives no indication of what the exceptions to this
  general rule might be. It then discusses the provisions
  of the Privacy Act in detail, placing considerable em-
  phasis on the limitations imposed by NASA's routine-
  use regulations. *Ante,* at 21–23. From the length of
  the discussion, I would bet that the Privacy Act is nec-
  essary to today's holding, but how much of it is neces-
  sary is a mystery.

4. It will dramatically increase the number of lawsuits
claiming violations of the right to informational privacy.
Rare will be the claim that is supported by none of the
factors deemed relevant in today's opinion. Moreover, the
utter silliness of respondents' position in this case leaves
plenty of room for the possible success of future claims
that are meritless, but slightly less absurd. Respondents
claim that *even though* they are Government contractor
employees, and *even though* they are working with highly
expensive scientific equipment, and *even though* the Gov-
ernment is seeking only information about drug treatment
and information from third parties that is standard in
background checks, and *even though* the Government is
liable for damages if that information is ever revealed, and
*even though* NASA's Privacy Act regulations are very
protective of private information, NASA's background
checks are unconstitutional. Ridiculous. In carefully
citing *all* of these factors as the basis for its decision, the
Court makes the distinguishing of this case simple as pie.

In future cases filed under 42 U. S. C. §1983 in those
circuits that recognize (rather than merely hypothesize) a
constitutional right to "informational privacy," lawyers
will always (and I mean *always*) find some way around
today's opinion: perhaps the plaintiff will be a receptionist

SCALIA, J., concurring in judgment

or a janitor, or the protections against disclosure will be less robust. And oh yes, the fact that a losing defendant will be liable not only for damages but also for attorney's fees under §1988 will greatly encourage lawyers to sue, and defendants—for whom no safe harbor can be found in the many words of today's opinion—to settle. This plaintiff's claim has failed today, but the Court makes a generous gift to the plaintiff's bar.

*    *    *

Because I deem it the "duty of the judicial department to say what the law is," *Marbury* v. *Madison*, 1 Cranch 137, 177 (1803), I concur only in the judgment.

# SUPREME COURT OF THE UNITED STATES

_____

No. 09–530

_____

## NATIONAL AERONAUTICS AND SPACE ADMIN-ISTRATION, ET AL., PETITIONERS *v.* ROBERT M. NELSON ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[January 19, 2011]

JUSTICE THOMAS, concurring in the judgment.

I agree with JUSTICE SCALIA that the Constitution does not protect a right to informational privacy. *Ante*, at 1 (opinion concurring in judgment). No provision in the Constitution mentions such a right. Cf. *Lawrence* v. *Texas*, 539 U. S. 558, 605–606 (2003) (THOMAS, J., dissenting) ("I can find neither in the Bill of Rights nor any other part of the Constitution a general right of privacy . . ." (internal quotation marks and brackets omitted)). And the notion that the Due Process Clause of the Fifth Amendment is a wellspring of unenumerated rights against the Federal Government "strains credulity for even the most casual user of words." *McDonald* v. *Chicago*, 561 U. S. \_\_\_, \_\_\_ (2010) (THOMAS, J., concurring in part and concurring in judgment) (slip op., at 7).